ELLIS, Judge.
Plaintiff filed this suit for workmens compensation in the maximum amount, alleging total and permanent disability as the result of an alleged accident to his left ankle, leg and foot on May 14, 1952, and a second accident and injury on December 18, 1954 to his left arm, shoulder and back.
Defendants admitted the accident and injury of May 14, 1952 to plaintiff’s foot and ankle but took the position that although there was some residual stiffness of the injured ankle, plaintiff was only entitled to recover under the specific disability provision of the workmens compensation law for partial loss of the use of the foot, but specifically denied that plaintiff was in any way disabled from performing the duties required of him in connection with his employment. Defendants further alleged that even should it be determined that the plaintiff had become disabled due to one or more neuromas which had formed on the side of the injured foot that such disability from these neuromas terminated prior to the institution of suit when plaintiff refused to permit such disability to be removed by a simple surgical procedure recommended by the medical examiners and offered to plaintiff at defendant’s expense. Defendants further alleged that they had attempted to discharge their admitted liability to plaintiff by offering to pay the amount due him for said disability prior to the institution of this suit, but that plaintiff had refused said offer. Defendants therefore denied that the plaintiff was entitled to recovery of anything over and above the admitted liability for workmens compensation benefits, as for the specific disability of partial loss of use of the foot, less the aggregate amount of workmens compensation benefits previously paid, which was admittedly $1,380.
The defendants also denied the second accident of December 18, 1954 and averred that any disability in the cervical back, shoulder and arm, if present, was not referable to or in any way associated with any accidental injury.
The Lower Court held that as to the shoulder injury “the testimony was very clear, definite and positive, that the trouble there is due to degenerative changes and not to accidental injury there is no causal connection between this disability and the work in which plaintiff was engaged. It seems that it was brought on by some virus involvement, for which Vitamin B-12 is given. It was not proved in this ca§e that the heavy lifting or straining or excessive exertion had caused or contributed to the physical breakdown complained of or had accelerated its occurrence.” The judgment of the Lower Court, therefore, denied the claim for disability for the alleged shoulder, back and arm injury but rendered a judgment for the plaintiff against the defendants in solido “for a partial permanent loss of function of his foot for a period of 125 weeks from May 14, 1952, at the rate of $18.20 per week, less a credit of 46 weeks for the period when plaintiff collected compensation, plus legal interest on the delinquent installments, de *904 fendants to pay all costs, including the fees of the doctors.”
Plaintiff has appealed from the judgment and the defendants have answered the appeal asking that they be relieved from the payment of costs, because they had tendered to the plaintiff on June 8, 1955, which was prior to the institution of this suit, $895 which was more than plaintiff would otherwise have been entitled to at the time the tender was made and was equal to the amount the court found that he was entitled to as for the specific disability and, therefore, under the general rule that costs, in every case, shall be paid by the party cast except where compensation has been allowed or real tenders made, in which latter event plaintiff is allowed to recover only the sum tendered him, citing Louisiana Code of Practice, Articles 549, 415.
In view of the fact that we believe that the plaintiff is totally and permanently disabled as a result of an accident on December 18, 1954, the reasons for which will be hereinafter set forth, and the plaintiff having been paid any and all compensation due as a result of his foot injury up to and including the time of the second accident and resulting disability on December 18, 1954, we will not discuss in detail plaintiff’s claim to total and permanent disability as a result of the foot injury.
This boils down to the question of plaintiff’s refusal to accept a third operation for the removal of the neuroma or neuromas (one doctor found five neuromas on the side of the foot at the time of the trial) which the evidence reveals is the only valid claim for total and permanent disability as a result of the accident and injury to the plaintiff’s foot and ankle.
The preponderance of the medical testimony is to the effect that even though these neuromas are excised by surgery that they have re-formed after each previous operation and that they will do so in the future. One doctor suggests that the nerve be severed far enough back in the soft tissue so that if the neuromas reappear they will not cause pain and disability, however, this doctor had previously operated on the plaintiff for this same trouble and the painful neu-romas re-formed.
Considering the facts we will not order that plaintiff undergo another operation or a series of operations to remove these re-forming neuromas. He is entitled to permanent and total disability for the injury to his foot.
The record reveals that plaintiff was forty-three years of age, married and on the date of the trial, October 21, 1955, was selling vacuum cleaners and floor polishes. He held a high school diploma and had attended junior college for a year and a half, but most of his work since the age of twenty on had been manual labor, such as laying concrete drainage tile for a fish hatchery in Alabama and loading slip scrapes for moving dirt, construction work for contractors and working with the telephone company. He had also worked for a tree surgeon. He started working for the telephone company in 1937 and continued until February 3, 1945, at which time he went into sales work for Paul, Rice and Levy out of New Orleans, where he suffered an automobile accident and as a result of his suit collected some compensation, however, his chest was injured in that accident and there is no connection shown between his present disability and that accident. He went to work for the defendant herein, the Tuboscope Company, on July 1, 1951, doing manual labor in connection with the inspection of oil field drilling pipe work. He was not given a physical examination when he went to work for the defendant company, lost no time nor had any trouble until his first accident of May 14, 1952 when a pipe fell on his left leg, ankle and foot. It is shown that he was definitely a good, conscientious workman, ambitious and on the second of January, 1952 he was sent to school in Houston by the defendant company and thereafter was given a rating of an operator. He was first a common laborer, next an assistant operator and then *905 an operator within six months, however, plaintiff testified that this was not any faster nor any slower than the average man would have been promoted with the same amount of experience. There is no question of plaintiff being a malingerer, however, there is some medical testimony that he might be exaggerating his symptoms.
Plaintiff’s work record and medical record after his injury of May 14, 1952 to the foot and ankle, which necessitated an operation to put a metallic screw in the bone and which later necessitated an operation for the removal of the metallic screw and the removal of a neuroma, and another operation for the removal of a neuroma, is positive evidence of the plaintiff’s desire to cooperate fully in an effort to recover from any foot disability. At the time that he was unable to perform manual labor as a result of his foot injury he did lighter work for which he was, of course, paid full wages by the defendant company.
As to the accident of December 18, 1954, plaintiff testifies that he was working in Harvey, Louisiana, on a sonoscope job as an assistant operator which, however, did not relieve him of performing manual labor such as the building of the rig. Plaintiff states that in hunting for blocks of timber to put under the sills, he attempted to pick up a short piece of timber, approximately 10 x 12 or 12 x 14, which had a large concrete slab on one end of it. “I felt that pain across my back and shoulder and into my arm here (indicating left shoulder) * * *. I thought it was just a- pulled muscle. It was a winter day and I didn’t even remark about it to Mr. Hymel at the time, who was the operator.” Plaintiff consistently felt the pain for approximately an hour and a half but he continued to do his part of the work for that length of time. He became unable to use his left arm and he finally asked his co-employee, Mr. Warren Thibodeaux, to exchange places with him, which was done. Three of the crew members were doing what he referred to as “walking the dog” when the exchange was made, and soon thereafter, Mr. Hymel, the operator on the job, saw that the plaintiff was having difficulty with his arm and he got out of the station wagon in which some electrical equipment was mounted and which he had been attending to and took the plaintiff’s place and the latter took over his duties of operating the electrical equipment for'the rest of the day. After working hours, plaintiff went to a drug store and secured some “Bengay” to rub his arm and shoulder. Upon his return he had a bath, changed clothes and one of his co-employees whose name he does not remember, rubbed the shoulder. That night they went out in the direction of New Orleans and had some drinks, and after a night’s sleep and upon arising the next morning he still felt the pain and as the job was finished he came back to New Iberia and immediately went to his home and to bed. He had trouble in sleeping without elevating his left arm by putting pillows under it.
The plaintiff’s boss on the job was Hymel who, of course, had full knowledge of plaintiff’s apparent disability which occurred while working on the job as related. Plaintiff also stated that he told a Mr. Plarold Lewis on December 21 about it. Plaintiff still thought he had just a pulled muscle and did no work between the alleged accident and the-21st of December other than cleaning up equipment around the warehouse on the 20th. On the 21st of December he reported to Dr. Gilly with .regard to his ankle injury and states that he told the doctor about his shoulder in a casual way and “told him I thought I had pulled it and told him I was still being troubled with it. He went on and checked my ankle.” In other words, Dr. Gilly made no examination of his shoulder.
Much is made of the fact' that Dr. Gilly testified that prior to and up to the end of 1954 plaintiff had not complained to him about his shoulder. Plaintiff only made one visit to Dr. Gilly after the injury to his shoulder, which was made on the 21st, and as explained by him he thought at that time it was only a pulled muscle, and he stated that he casually mentioned’ it to Dr. Gilly, *906 It could well be that he did this and Dr. Gilly would not have been impressed by plaintiff telling him about his shoulder as he had come to see him with regard to his ankle, and on this visit Dr. Gilly discharged him insofar- as the ankle was concerned. Be this as it may, it really fades into insignificance in this case in view of the fact that Dr. Gilly as well as Dr. Zink, Dr. Karr, Dr. Llewellyn, Dr. Duncan and Dr. Dalton found objective symptoms and disability as the result of the condition of the plaintiff’s shoulder and back.
Testifying on behalf of the defendant was Lloyd Hymel, who was the operator and immediate boss of the plaintiff on the day he was injured. Although this witness testified that in doing the work on that day it was necessary for the men to pick up 8" x 10' sills approximately 20 feet long as well as concrete blocks to put under the sills. However, he had never heard that the plaintiff felt the pain when “trying to wrest one of those blocks from under some concrete.” However, of greater significance and more importance is his testimony as follows:
' “Q. Did you hear ' Mr. Woodfin complain about any pain? A. You mean while he'was working the jack? I looked outside and saw Mr. Woodfin go between the racks and walk the dog and Mr. Thibodeaux started working the jack and I then asked what was the matter.
“Q. What did you find out? A. Mr. Woodfin told me his shoulder was hurting.
“Q. That is all he said?' Did he say what caused it to start hurting? A. No, sir.
“Q. Did his shoulder continue to hurt him that day ? A. It did.
“Q. From the moment- on that you saw him change positions? A. I asked if he thought he could handle the .job in the middle. He said he would try. When I saw he was in a great deal of pain I offered to let him run the unit which consisted of flipping four switches and I took his place out on the rack.
“Q. Did you ever before this morning hear Mr. Woodfin say that he had strained himself on that particular day? A. No, I never did know the nature of how the pain occurred. I never did get the story on that.
“Q. Now, you had worked with Mr. Woodfin before that’day? A. I had.
“Q. Had he been doing the work satisfactorily? A. Yes, sir.
“Q. Did it appear to you that he was able to perform the work he was doing? A. You mean before this day?
“Q. Yes. A. Yes.
“Q. Ever give you any indication that he couldn’t do the work? A. No, he always did his work.
“Q. He ever complain he couldn’t do it? A. The only time he ever complained before that day was his ankle bothered him.

“Q. You’ve seen him a lot since that day, or while he was still in the employ of Tuboscope did you see him a lot ? A. I came in contact with Mr. Woodfin on approximately two jobs after that day or . when I would just happen to see him.
“Q. Whenever you would see him was he always complaining of his shoulder ? A. He would mention it to me, yes sir.
¡fc * * ■ * * *
“Q. You stated, Mr. Hymel, that you could see Mr. Woodfin was in strain and in pain, I believe were your words, and you therefore let him *907 get inside the unit, is tliat correct? A. That is correct.
“Q. How could you tell he was in strain and pain ? A. After he would go to the middle to identify the pipe it had to be rolled away and he was trying to do it with one arm.
“Q. He was trying to do it with one arm? A. Yes, and I saw that he was having trouble so I offered to go out and take his place.”
Warren Thibodeaux, another co-employee of the plaintiff on the day he was injured testified that while picking, up blocks and building the rig he never heard the plaintiff complain of his shoulder hurting him. He did corroborate the plaintiff in that he testified the plaintiff complained to him of his shoulder hurting him when he was walking between the rack and the plaintiff asked this witness if he would trade places with him, which, according to plaintiff and Hymel, was done.
Harold E. Lewis, another co-employee on the date of plaintiff’s alleged shoulder and back injury, testified that he was employed as personnel manager with power of general supervision over the crews and that when the plaintiff returned from the job on which he allegedly hurt- his shoulder he was told by Mr. Hymel that the plaintiff had gotten hurt., Hymel told this witness that ■ plaintiff had pulled a muscle in his shoulder or something to that effect. In other words, the company through its proper representative was notified of plaintiff’s injury as soon as the crew returned from the job on which he was injured on December 19, 1954. When ásked how he understood plaintiff was - injured, this witness stated “11 understand it was building racks and that was the extent 'of my knowledge.” The accident report was actually made out by the officer manager, Crouchet, who testified that on approximately January 29, 1955 he made a ■ formal report althoügh he had previous knowledge of plaintiff’s shoulder injury, and in explanation of why the report was not made until the end of January stated “because for a while we were of the impression that the injury -was more or less from natural causes rather than through accidental cause.” He also stated, however, ' that plaintiff had told him that the pain had started while he was on the job. This witness testified that he received the following information with regard to the report of the plaintiff, viz.:
“Mr. Woodfin at that time stated to me that he had visited Dr. Zink and that the injury was due to the accident he had had before which had left his injured leg a quarter of an inch shorter than the other and this would cause his back to be off balance and would cause the injury which he had received at the time that he was on the job, because of 'his back being off balance, it caused his shoulder to strain and he .related it back to this previous accident he had.”
It is clear that plaintiff must have thought that due to the injury to his foot and ankle he was off balance when attempting to pick up the sill or slab which caused the shoulder strain.
This court in Zito v. Standard Accident Insurance Company, 76 So.2d 25, 29, stated:
“In passing upon the question of whether plaintiff has proven his accident, it is well to remember that even in cases where the employee is unable to produce other eye witnesses of the alleged accident in which he sustained injuries, he is not barred from recovery of compensation if his explanation of the accident and injuries was corroborated by surrounding circumstances.”
There is no question in our mind but that the plaintiff has been amply corroborated in thÍ9 case when we consider his previous work record, his cooperation, *908 the fact that he was not a malingerer and, above all, the testimony of the men with whom he was actually working on the day he claims to have injured himself. ,The only uncorroborated part of this man’s testimony is that the injury resulted at the time he picked up on the sill or slab which had a concrete block on the end of it. However, everything that he said concerning the accident was fully corroborated, and it is reasonable and logical to believe that it happened in the manner sworn to by the plaintiff. We therefore conclude that the plaintiff has shown an accident within the meaning and contemplation of the compensation act in accordance with the well-established jurisprudence.
The only question remaining is the extent of plaintiff’s disability.
Plaintiff was seen by Dr. Howard Karr, an orthopedist of New Orleans, La., and according to a letter of February 14, 1955 signed by Dr. Karr and filed in evidence, the plaintiff came to his office on that day. Dr. Karr states in part in this letter:
“On December 18, 1954 this patient states while working on some drill pipe, an hour and a half after he started work his left arm began to ‘draw up on me.’ He indicates his arm began to hurt in a region which he indicates to be just at the lower attachment of the deltoid on the lateral aspect of the left arm. He indicates also the upper and medial border of the left scapula associated with a ‘sore spot.’ However, there is no history of trauma; this just came on spontaneously. Because of this discomfort he states he had to work on the inside- of the truck instead of the outside.’’
* * $ * * *
“Examination discloses no sensory alterations or reflex alterations of the left upper extremity. The musculature of the left upper .arm is not involved. The left shoulder blade discloses there is very mild atrophy of the left infraspinatus muscle, and an abduction of the arm, he definitely has a movement of the scapula which is typical and characteristic of a ser-ratas anterior palsy, otherwise referred to as a paralysis of the long thoracic nerve.
“The present findings produce the precise disabiltiy of which the patient complains, his chief disability being produced on attempted abduction of the left upper extremity.
“With respect to the origin of this disability, many of these long thoracic nerve palsies originate as a result of some neuritic process, similar to what occurs in the ordinary Bell’s palsy, wrist drop or foot drop. Certainly in the absence of trauma, this palsy must be considered to originate on spontaneous grounds and I therefore recommend that he receive large doses of thiamine chloride and that he return in one month in order that some prognostic sign with respect to improvement might be obtained.” (Emphasis added.)
We have another letter from Dr. Karr in evidence dated March 14, 1955 in which he states in part:
“The neurological examination of the upper extremities reveals that there has been no progression of this process and there has been no evidence of any improvement.
“The patient has been on thiamine chloride and vitamin B12. He has taken the B12 about three times a week. I feel that the B12 should be administered once a day for ten days, 1000 micrograms a day. I have no reason to revise my previous estimate of this man’s situation. * * * ”
It is to be noted that Dr. Karr states there is no history of trauma, however, *909 it is clear from the statement made by plaintiff to Dr. Karr that whatever happened to cause the pain in this man’s shoulder occurred while performing hard manual labor for the defendant company. Again Dr. Karr states: “in the absence of trauma” the plaintiff’s condition must be considered to be originated on, “spontaneous ground.” We have already found that plaintiff’s condition occurred at the time and in the manner testified to by him so as constitute an accident within the meaning of the law, and although Dr. Karr did not consider plaintiff’s statement as to the occurrence as being a “history of trauma”, from a legal standpoint we hold that the testimony does show an accident and trauma under the established jurisprudence.
Dr. James Gilly not only saw this plaintiff many times but also operated on him for his foot condition but the first time he saw him after his accident of December 18, 1954 was on December 21, 1954 when he discharged him with relation to his foot injury. On this day he stated plaintiff did not tell him of the shoulder trouble nor did he, of course, make any examination. Plaintiff was seen by Dr. Gilly again on February 10, February 24 and May 12, 1955. Dr. Gilly testified that plaintiff was seen presumably by his partner, Dr. Zink, in February for a painful shoulder. He summarized the findings of Dr. Zink in part as follows:
“There was noticeable marked atrophy of the infra-spinatus muscle mass which is just above the supra-spinatus muscles. On forward flexion of the shoulder and on abduction the scap-ulo-humeral rhythm appeared to be normal. However, on returning of the arm fr.om the forward flexed po--sition to a position at the side a definite catch and obvious clicking of the scapula could be noted. Palpation indicated the fact that the tip or the inferior, angle of the scapula was rubbing against each rib and skipping over that ' rib much as á boy would place a stick between the pickets of a fence and scrape it along. This was the uncomfortable sensation and catching feeling which he described. In addition, there was a tender area over the lateral portion of the infra-spinatus muscle near its attachment to the humerus. There were no cutaneous neurological disturbances demonstrated in the left upper extremity.”
“The patient apparently exhibited a localized neurological lesion with involvement of the infraspinatus muscle and of the lower portions of the Ser-ratas anterior muscle which permit the scapula to dip into the intercostal spaces rather than gliding smoothly over the outer surfaces of the ribs. I felt that the site of the lesion as far as the super-scapula nerve is concerned would probably be in the granted scapule notch; that is, between the supraspinatus muscle which is apparently normal and the infraspinatus muscle. In addition, there was apparently a traction lesion of a portion of the long thoracic nerve as it passed in the medial axillary wall.”
On the report that should have been “medial” rather than “lateral.”
“Q. Doctor, what did you conclude as a result of this examination? '
“A. I felt that the patient showed definite evidence of disability for performance of heavy work, and I also recommended that he be seen and evaluated by a neurological surgeon.”
Dr. Gilly saw plaintiff after he had been seen by Dr. Karr in New Orleans and testified to a telephone conversation which he had with Dr. Kafr in which the latter “told me that he thought it was a virus involvément of the brachial plexus” and that there was no treatment so far as he knew, that one could only sit and expect to get well. After this he saw plaintiff on May 12, 1955 and he testified 'that plaintiff’s shoulder was the *910 same, in other words, still disabled. He found no improvement and he still found atrophy of the shoulder muscles. Dr. Gilly stated that the virus infection of the left brachial plexus which Dr. Karr told him about in a phone conversation could be the result of trauma, in other words, that the “probability of trauma is always there,” as a cause of the plaintiff’s disabling condition. He stated that a decision as to whether the condition was caused by trauma would be one of judgment and “of course, that judgment would be influenced by the patient’s history.” He stated that he did not know whether the plaintiff’s shoulder was in the disabling condition prior to December 18, 1954 and that it could have been caused by a virus infection or it could have been caused by trauma. He very frankly stated that as far as he was concerned, the cause was unknown. He also frankly stated that he found the shoulder condition disabling and that heavy muscular strain would be detrimental to the plaintiff’s condition as he had found it in May of 1955.
Dr. Llewellyn saw the plaintiff on April 6, 1955 and June 3, 1955, and upon both occasions he found definite objective elements of some shoulder disorder, and upon the second visit he found a progression of the symptons. He did, not find any evidence of the virus infection as the cause of plaintiff’s difficulty with his left shoulder. He also found the plaintiff to be completely cooperative and plaintiff “did not try to influence me by partial replies or misleading statement as to his complaints or as to his responses to muscle testing.” He also testified that the plaintiff’s history of the commencement of the pain and his symptoms could be possibly entirely consistent with his subsequent findings. He did state that the x-ray changes noted would be unlikely to have occurred subsequent to the 5th month of plaintiff’s complaints. It was his opinion and he stated that he did not find anything that would indicate that the plaintiff’s condition was caused by trauma. However, he made the same recommendation as the other doctors that because of plaintiff’s condition he abstain from hard manual physical labor, and on cross examination he also stated that such labor would aggravate or worsen the condition. He also stated that there would be no way in which he could tell whether the heavy lifting or hard manual labor had aggravated the condition which he believed existed prior to December 18, 1954, but “it is certainly conceivable, in my opinion, that this man could, by hard manual labor, aggravate what I thought was the then existing condition.”
Dr. Thomas D. Duncan testified on behalf of defendant that he examined plaintiff on April 6, 1955. He found some atrophy in the musculature of the left shoulder blade as compared to the right; plaintiff was protective in using his left upper extremity; plaintiff exhibited a grating noise in the left scapula or left shoulder blade; when he would pump his arm up and down, a grating could be produced; he found no spasms of the neck muscles or back muscles; he noted as did all the other doctors the narrowed fifth cervical disc space on the x-rays. He stated that actually he could not find an awful lot wrong with plaintiff’s left upper extremity and he thought that although he had a basis for his complaints they were exaggerated. He explained that the basis for the plaintiff’s complaints were the degenerative changes in his cervical spine; he found no evidence that the degenerative process had been aggravated by any particular incident. He was of the opinion that plaintiff’s shoulder and am were not disabling and he saw no indication whatsoever of any virus infection causing plaintiff’s symptoms.
Dr. Dalton, a general practitioner, first treated the plaintiff as a result of the automobile accident and chest injury he suffered in 1950 and again for the foot accident and injury of May 14, 1952, and he last saw plaintiff on October 11, *911 1955, although he had examined plaintiff’s left shoulder on several occasions. He found atrophy of the musculature of the scapula group of muscles and also the grating noise when rotating his shoulder anteriorally. He testified that in forming his opinion as to the cause of plaintiff’s shoulder condition, he could only go by the history which was given to him by the patient, and “there too you had a history of trauma”. His memory as to this history was that plaintiff was lifting a heavy length of pipe, while plaintiff stated that he was lifting a sill with a concrete block on one end of it, however, this difference is insignificant in that a doctor could be mistaken. He apparently made no notes .of the history as given by plaintiff and, furthermore, there is no question from this testimony that this plaintiff on the date claimed, December 18, 1954, while performing manual labor either suffered an injury by virtue of his physical conditioner as particularly described by him which caused a total and permanent disability or while performing manual labor something happened within his body which caused the condition. This doctor’s testimony was that plaintiff was disabled as a result of his shoulder condition as well as his ankle condition.
Thus we see that all of the doctors save one described the plaintiff’s shoulder condition as disabling and none of them could definitely rule out the cause as arising from trauma as the result of the accident which occurred on December 18, 1954. The doctors admit that it could have happened as the result of trauma or as a result of an aggravation of a pre-existing condition. In view of the fact that the plaintiff was apparently well and sound on December 18, 1954 and prior thereto with the exception of his ankle injury and disability resulting therefrom, and while performing manual labor for the defendant felt a pain which he says resulted from lifting or attempting to lift h@avy material' and which within an hour or an hour and a half he not only told his co-employees about but it was necessary that his co-employees relieve him of his duties and the preponderance of the medical testimony being to the effect that the condition from which he suffered from the date of the accident was totally and permanently disabling and could have resulted from trauma or an aggravation of a pre-existing condition or could have been the result of a virus infection or degenerative process not connected with his employment, we are of the opinion after a careful consideration of this record as heretofore detailed that the plaintiff’s condition was the result of an accident within the meaning of the compensation act and was brought about by specific trauma connected with his employment or by an aggravation .of a pre-existing condition, and he is therefore entitled to a judgment for total and permanent disability in the maximum amount.
Plaintiff was paid either in compensation or wages up to and including February 17, 1955 at which time he was discharged to be placed on compensation, however, there is no evidence in the record, that it was paid after that date. He is, therefore, entitled to a judgment for compensation from December 18, 1954 subject to a credit of all amounts paid to him through January, 17, 1955.
It is therefore ordered, adjudged and decreed that the judgment of the District Court be reversed and that there now be judgment in favor of the plaintiff and against the defendants awarding plaintiff compensation as for permanent and total disability in the full amount of $30 per week beginning December 18, 1954, during disability and not to exceed 400 weeks subject to a credit for all compensation and wages paid not to exceed $30 per week from December 18, 1954 to January 17, 1955, together with legal interest frbm the maturity of all past due installments.
*912 It is further ordered, adjudged and decreed that the fees of the following doctors and medical experts and as expert witnesses be and they are hereby fixed in the amount set opposite their respective names and taxed as costs:
Dr. Orien E. Dalton $50.00
Dr. R. C. Llewellyn $50.00
Dr. Thomas L. Duncan $50.00
Dr. James L. Gilly $50.00
It is further ordered, adjudged and decreed that defendants herein pay all costs of court of these proceedings.